## OCKERMAN v. FAULKNER'S GARAGE, Inc.

Court of Appeals of Kentucky.

June 5, 1953.

Rehearing Denied Oct. 30, 1953.

C. A. Noble, Hazard, for appellant.

Alva A. Hollon, Hazard, Mahan, Davis & Mahan, Louisville, for appellee.

MILLIKEN, Justice.

Appellant, Reverend R. F. Ockerman, instituted this action against Drew Faulkner and Faulkner's Garage, Inc., for personal injuries sustained when he fell from a freight elevator while on the garage premises. At the conclusion of all the testimony, the court sustained a motion for a peremptory instruction in favor of Faulkner's Garage, Inc., and the case proceeded as to Drew Faulkner. The sole question on this appeal involves the propriety of the peremptory instruction as to the garage corporation.

On the afternoon of May 8, 1951, Reverend Ockerman went to Faulkner's Garage in Hazard, Kentucky, to see Mr. Drew Faulkner concerning "the improvement program in progress at the Methodist Church." Upon entering the garage he asked an employee where Mr. Faulkner was and was told that he was in the "Dr. Pepper build-

ing" which is the name used to refer to a two-story building owned by Mr. Faulkner next to the "old garage." As owner of the Dr. Pepper building, Mr. Faulkner had leased the entire first floor and a portion of the second floor to the garage and was converting a portion of the second floor into apartments.

Reverend Ockerman walked from the "old garage" through a passageway into the Dr. Pepper building where he was spoken to by name. At this time Mr. Faulkner was on the second floor overseeing work on his apartments. A freight elevator situated in the rear of the first floor of the building was the only means of access to the second floor. The elevator consisted of a small platform without guardrails, was electrically operated, and its path of ascent and descent was guided by vertical rails attached to the wall. It could be set in motion by pulling a line which tripped an electric switch. The unidentified person who had called Reverend Ockerman by name apparently did not expressly invite him to ride on the elevator, nor did anyone else, but he did follow him to it and pulled the line which started the elevator with Reverend Ockerman aboard. The elevator proceeded upward toward the second floor, but "slipped" and fell a few feet until halted by an automatic stop. Reverend Ockerman lost his balance and fell to the first floor where he sustained personal injuries.

The proof discloses that Reverend Ockerman was a frequent visitor to the garage premises to see Mr. Faulkner about church work; that he came there an average of once a week; that Mr. Faulkner had recently conducted him on a personal tour of the premises; and that he had previously taken him to the second floor on the elevator. There is also proof that the elevator had slipped on two or three prior occasions, but that it had been repaired previous to the accident and was thought to be in good mechanical order when Reverend Ockerman boarded it.

Mr. Faulkner testified pertaining to his invitation to Reverend Ockerman to visit the garage and premises, that he was al-

ways welcome to come to see him, but that he "didn't extend him any special invitation more than I would ordinarily anyone else." There is no evidence that Reverend Ockerman at any time came to the premises for a purpose connected with the garage business.

In the light of the evidence we think it is clear that Reverend Ockerman was not on the premises as a business visitor to whom the possessor of the premises owed a duty to discover the actual condition of the premises and either make them safe or to warn him of the dangerous condition. "A business visitor is a person who is invited or permitted to remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them." Restatement of the Law of Torts, § 332; City of Madisonville v. Poole, Ky., 249 S.W.2d 133. At most, Reverend Ockerman was a licensee to whom the garage owed no duty as to the condition of premises other than that of not knowingly letting him run upon a hidden peril or wilfully or wantonly causing him harm, Baird v. Goldberg, 283 Ky. 558, 142 S.W.2d 120, and, "applying the general rule to elevators, it may be said that the owner or operator of such an instrumentality is under no obligation to mere licensees coming near or riding thereon except to refrain from wilful or wanton injury." 18 Am.Jur., § 36, page 543, "Elevators and Escalators"; Kentucky Distilleries & Warehouse Co. v. Leonard, 79 S.W. 281, 25 Ky. Law.Rep. 2046; Indian Refining Co. v. Mobley, 134 Ky. 822, 121 S.W. 657, 24 L.R. A.,N.S., 497.

However, the appellant earnestly argues that it is a jury question whether Mr. Faulkner, as president of the Garage Company, or other officers and employees thereof, should not have realized that the condition of the elevator involved such an unreasonable risk to any licensee that a duty was owed the licensee to make the elevator safe or to warn the licensee of the condition of the elevator and the risks involved; citing Kentucky & West Virginia Power Co. v. Stacy, 291 Ky. 325, 164 S.W.2d 537, 170

A.L.R. 1, as his authority therefor. Disregarding the question of whether the appellant really was licensed to visit that part of the garage establishment located in the Dr. Pepper building and to use the elevator there, we recognize marked distinguishing features between the Stacy case and the present one. Colonel Stacy attended a meeting called by the County Farm Agent which was held, through the courtesy of the Power Company, in a third floor room of its building. For more than a month prior to and on the day of the meeting natural gas had been found in the building and it was of such a sulphurous odor that some of the Power Company personnel had been made ill by it. The gas had been discovered bubbling through a well in the basement and no attempt had been made to rectify the condition. With full knowledge of the situation the Power Company sent an inspector into the basement to check its air conditioning coils and to relocate a fan which had a tendency to overheat because of the lack of ventilation around the motor. In this work the inspector used an alcohol torch with an open flame which resulted in a terrific explosion, killing one person and injuring many others, including Colonel Stacy. It was held that the liability of the Power Company hinged upon circumstances not determined by the original entry of gas into the premises, but upon the failure of the Power Company either to rectify the condition or to warn Colonel Stacy, as an innocent licensee, of the situation and the risk involved therein, citing Restatement of the Law of Torts, § 342, page 932.

██ In the case at bar Reverend Ockerman, unlike Colonel Stacy, was in a portion of the building where his presence was hardly expected and used an elevator which the general public was not invited to use. In the circumstances of this controversy, assuming arguendo that the garage company had control of the elevator, we do not believe that a case has been made out for the application of the principle invoked in the Stacy case. There is an impressive difference between thoughtlessly exposing a known licensee, a guest, to the incompatibility of natural gas and a torch's flame, and

leaving an erratic freight elevator in a remote part of a business establishment available for possible use by a casual visitor. There was active negligence in the Stacy case, and merely acquiescence in the status quo in the case at bar. We think it clear that the garage company did not knowingly let Reverend Ockerman run upon a hidden peril, or wilfully or wantonly cause him harm and, as a consequence, we conclude there was no question to submit to a jury.

The judgment is affirmed.